SOCIETY FOR ANIMAL RIGHTS, INC., ANIMALS IN DIS-
TRESS, INC., LUCKY HOLLOW ANIMAL WELFARE SO-
CIETY, INC., CUMBERLAND COUNTY DISTRICT SPCA,
INC., CATS AND CAT OWNERS AID, INC., NOAH'S ARK
ANIMAL WELFARE ASS'N., INC., HUDSON COUNTY DIS-
TRICT SPCA, INC., OCEAN COUNTY DISTRICT SPCA,
INC., GENEVIEVE SANTA LUCIA, MARTIN WILLIAMS,
GENEVIEVE MODRYS, NICHOLETTA DEFLECE, ANNA
LEUTHNER AND RENA CAVERLY, PLAINTIFFS, v. THE
TOWNSHIP OF MAHWAH, THE BOROUGH OF ALPINE,
THE BOROUGH OF BERGENFIELD, THE BOROUGH OF
BOGOTA, THE BOROUGH OF HO-HO-KUS, AND THE
TOWNSHIP OF LYNDHURST, (MUNICIPAL CORPORA-
TIONS OF THE STATE OF NEW JERSEY) AGAINST
ALL OF THEM AND ALL OTHERS SIMILARLY SITU-
ATED; AND ALSO AGAINST THE TOWN OF KEARNY
AND THE TOWN OF GUTTENBERG, (MUNICIPAL COR-
PORATIONS OF THE STATE OF NEW JERSEY) AND
AGAINST ALL OF THEM AND ALL OTHERS SIMILARLY
SITUATED; AND ALSO AGAINST U-MAIN ANIMAL CEN-
TER, ASSOCIATED ADOPTION AND RESCUE AGENCY,
MODERN ANIMAL CARE, GI-GI KENNELS AND ALFRED
GROHSMAN, AND ALL OTHERS SIMILARLY SITUATED,
DEFENDANTS, v. COMMUNITY DOG CONTROL, INC., DE-
FENDANT-INTERVENOR.

Superior Court of New Jersey
Law Division

Decided December 9, 1975.

324

326

*Mr. John N. Malyska* (*Messrs. Meyner, Landis & Verdon,* attorneys), and *Nancy Stassinopoulos, pro hac vice,* for plaintiffs.

*Mr. Samuel M. Lyon* for defendant Borough of Ho-Ho-Kus (*Ms. Sandra Spizziri* on the brief).

*Mr. E. Carter Corriston* for defendant Township of Mahwah (*Messrs. Breslin and Breslin,* attorneys).

*Mr. Gabriel M. Ambrosio* for defendants Township of Lyndhurst, U-Main Animal Center, Associated Adoption

and Rescue Agency, and Alfred Grohsman (*Messrs. Ambrosio & Ambrosio,* attorneys).

*Mr. Norman A. Doyle* for defendant Town of Kearny (*Messrs. Doyle and Brady,* attorneys).

*Mr. John Thomasin* for defendant Town of Guttenberg (*Mr. William J. Perich* on the brief).

*Mr. Harvey R. Sorkow* for defendant The Borough of Bergenfield (*Messrs. Gruen, Sorkow & Sorkow,* attorneys).

*Mr. Robert C. Littman* for defedant Gi-Gi Kennels.

*Mr. Gregory S. Baxter* for defendant-intervenor Community Dog Control, Inc. (*Messrs. Saling, Moore, O'Mara & Coogan,* attorneys).

PRESSLER, J. C. C., Temporarily Assigned. Plaintiffs, a group of nonprofit societies for the humane care and treatment of animals (hereafter humane societies) and a group of individual residents and taxpayers of various municipalities of this State brought this declaratory judgment class action in lieu of prerogative writ against five commercial dog pounds and seven named municipalities as representatives of all municipalities in the State. The relief which plaintiffs seek is a judicial construction of *N. J. S. A.* 40:48–5.1 and related statutes which would prohibit all municipalities from contracting with commercial pounds for the performance of what are essentially dog-warden and poundkeeping services and would hence require every municipality to either maintain its own dog pound or to contract for the performance of these services with another governmental unit or with a nonprofit humane society. A sixth commercial pound, 'Community Dog Control, Inc., which services 43 municipalities in Ocean and Monmouth Counties, was granted leave to intervene as a party defendant. All named parties moved

for summary judgment, each asserting that no genuine issue of material fact exists.

Clarification of the nature and scope of the meritorious questions here raised, of first impression in this State, requires a brief recitation of the procedural, statutory and undisputed factual background of this controversy in its present posture.

*N. J. S. A.* 40:48–5.1, originally adopted in 1928 and modified in 1937, provides in full as follows:

Wherever in any municipality there shall not be established under municipal authority a public pound for the keeping of stray dogs, cats or other domestic pets, and there shall exist in the county wherein such municipality is situated, a pound maintained by any humane society or other similar association, not organized for pecuniary profit, which shall have continuously maintained said pound for at least one year, such municipality shall enter into negotiations and may contract with such society or association for any period not exceeding five years, for collecting, keeping for redemption and destroying all such stray animals found within the municipal limits.

Any provision of any law requiring advertisement for bids before the letting of any contract involving the expenditure of money shall not be applicable to the making of any such contract with such society or association.

The statute, therefore, establishes two classes of municipalities which do not maintain their own pounds: those situate in counties in which there is a humane society pound and those situate in counties in which there is not. The first five named municipal defendants, Mahwah, Bergenfield, Bogota, Ho-Ho-Kus and Lyndhurst, are all located in Bergen County in which there is no humane society pound, and each of them, having no municipal pound, has contracted with one or the other of the commercial defendants for the performance of pound-keeping services. The other two municipal defendants, Kearny and Guttenberg, are situated in Hudson County in which there are several humane society pounds. Neither of these defendants has negotiated with any such society, having also contracted with one or another of the commercial defendants. It is alleged by plaintiffs, and

not disputed, that in addition to Hudson County, the Counties of Atlantic, Burlington, Camden, Cape May, Cumberland, Essex, Middlesex, Monmouth, Morris, Ocean, Somerset and Union have humane society pounds. These have been referred to by the parties for convenience as the Hudson-type municipalities. The Counties of Gloucester, Hunterdon, Mercer, Passaic, Salem, Sussex and Warren, like Bergen do not have humane society pounds. These are the so-called Bergen-type municipalities.

As their preliminary procedural step, plaintiffs moved pursuant to $R.$ 4:32–2(a) for a determination of maintainability of this suit as a class action. This court, after hearing, entered an order permitting the action to so proceed in accordance with $R.$ 4:32–1(b)(3), but against two separate classes of defendants, the Bergen-type municipalities and the Hudson-type municipalities. The five Bergen County municipal defendants were designated as representatives of the first class and the two Hudson County municipal defendants were designated as representatives of the second class. The order further directed, in accordance with $R.$ 4:32–2(b), that mailed notice of the pendency of the action be given to every municipality in the State and to the New Jersey Attorney General, the notice to advise, among other things, that any municipality either maintaining its own public pound or having a contract with a nonprofit humane society would not be considered a member of either class. The notice further advised that any class member might request exclusion within a specified time or, if not requesting exclusion, might enter an appearance.[1] The order further held that the plaintiffs had sufficient standing to prosecute the action.

---

[1] No class member entered an appearance. Sixteen class members requested exclusion, namely the Townships of Holland and Tewksbury in Hunterdon County; the Townships of Jefferson, Morris, Rockaway and Boonton in Morris County; the Borough of Saddle River and the Village of Ridgewood in Bergen County.

The question of law common to both classes is whether the applicable statutory complex empowers any municipiality to contract with a commercial poundkeeper, plaintiffs maintaining that it does not. If plaintiffs are correct then the Bergen-type municipalities may, as all parties agree, provide this service only by maintaining their own dog pounds or contracting with another governmental unit which does so, and the Hudson-type municipalities would have the third alternative of contracting with a humane society. If plaintiffs are incorrect then there is concededly no impediment to the Bergen-type municipalities' use of commercial services other than that imposed by public bidding requirements generally. As to the Hudson-type municipalities, two additional legal questions are raised. The first is the nature and scope of the municipal obligation under the mandate of *N. J. S. A.* 40:48–5.1, requiring that these municipalities "shall enter into negotiations and may contract" with non-profit humane societies. The second is the claim of the commercial defendants that this mandate is based on an unreasonable classification *vis-a-vis* profit and nonprofit pound-keepers and hence constitutes a denial of equal protection in derogation of the Fourteenth Amendment of the Federal Constitution.

As to the common legal question, it is the conclusion of this court for the reasons hereinafter stated that the only qualification upon a municipality's right to contract with a commercial pound is the "shall negotiate" provision of the quoted statute and hence that there is no qualification at all in respect of the Bergen-type counties.

██ It is first evident, and all parties agree, that the removal of stray domestic animals from the public streets and their ultimate disposal is not only an appropriate but also a necessary governmental function traditionally performed or arranged for by municipalities in the interest of public health and safety. The propriety of municipal responsibility for the performance of these services has, moreover, been historically acknowledged and approved by the Legislature

since the 18th Century. See, *e .g., White v. Tallman,* 26 *N. J. L.* 67 (Sup. Ct. 1856). And see also *N. J. S. A.* 4:19–15.16 and *N. J. S. A.* 26:4–90. That being so, it is clear that except to the extent of the qualification of *N. J. S. A.* 40:48–5.1, municipalities, by virtue of the express authority of *N. J. S. A.* 40:48–5, would be free to render poundkeeping services by contracting with commercial pounds subject to public bidding requirements, that statute providing that with respect to services which a municipality is empowered to render

* * * it may, in lieu of providing and maintaining the equipment necessary for rendering such service at its own expense, contract with any person to render such service on behalf of the municipality, under its control and direction. No such contract shall be let until specifications showing in detail the service to be rendered shall be prepared and rules and regulations governing the same shall be adopted. The contract shall be let, after due advertisement, to the lowest responsible bidder, who shall give ample security for its proper performance.

As to the broad scope of the authorization of this statute and its inclusion of functions within the police power, see generally *Schnell v. Millburn Tp.,* 127 *N. J. Super.* 155 (App. Div. 1974), aff'd o.b. 66 *N. J.* 137 (1974).

*N. J. S. A.* 40:48–5.1 aside, there is other clear statutory indication that municipal contracting with commercial poundkeepers has long since been within legislative contemplation. *N. J. S. A.* 4:19–15.16, adopted in 1941 and amended in 1959, 1973 and 1974, expressly authorizes, on municipal initiative, the impoundment and disposal of stray dogs. Commercial pounds have, since 1941, been subject to a mandatory annual municipal licensing requiring "written approval of the local municipal and health authorities showing compliance with the local and State rules and regulations governing location of and sanitation at such establishments." *N. J. S. A.* 4:19–15.8. They are also, of course, subject to State Department of Health regulations adopted pursuant to

the enabling legislation of *N. J. S. A.* 4:19–15.10.[2] It is also clear that commercial pounds were intended by *R. S.* 4:19–15.16 as proper repositories of animals taken into custody under the authority of that legislation. That construction is compelled by the verbiage of the statute itself. First, as a result of the 1974 amendment, the statutory reference is to "pound" without any differentiation or qualification. More significantly, since the original version of the statute, municipalities have been granted not only the authority to act directly in complying with the impoundment mandate but also have been authorized "to cause" such action to be taken. This juxtaposition can only be construed as authorizing municipalities to make any appropriate and available arrangements for impoundment, including arrangements with commercial pounds pursuant to public bidding.

Nor does *N. J. S. A.* 40:48–5.1 constitute, as plaintiffs suggest, a general prohibition on such contracting, particularly in respect of the Bergen-type municipalities which, as a matter of plain meaning, are not even arguably within its mandate. Nor were they, as a matter of legislative history, intended to be. The statement of purpose annexed to Assembly Bill 151, enacted as *L.* 1928, *c.* 83, the predecessor of *N. J. S. A.* 40:48–5.1, read in full as follows:

The purpose of this act is to assure the humane catching and care of dogs and other pets running at large and where necessary the painless destruction of them. It has been found from experience that the commercialization of this kind of work has resulted in undue cruelty and that to bring about proper conditions the work should be carried on by some humane organization which is not interested in using the animals for purposes of compensation. The act relieves municipalities of the necessity of advertising for contracts putting this type of work into commercial competition but protects the municipality by an arbitration provision from undue demands on the part of the institution.

---

[2] These regulations have been codified as *N. J A. C.* 8:23–3.1 to 8:3.12 inclusive, which apply equally to pounds maintained by profit and nonprofit entities.

The assumed "undue cruelty" of commercial pounds which expressly motivated this legislation has apparently been effectively eliminated by the original 1941 enactment of *N. J. S. A.* 4:19–15.16, by its 1974 amendment, by the licensing provisions heretofore cited and by the State Department of Health regulations governing the operation of such business.[3] It nevertheless is significant to note that the legislative response in 1928 was not, as it could have been, to prohibit a municipality from contracting with commercial pounds, a practice whose currency it expressly acknowledged, but was only by way of providing an alternative to such contracting, exempt from the public bidding laws, for those municipalities not maintaining their own pounds and situate in counties in which a nonprofit humane society pound was located. The nature of this legislative response, particularly in view of the subsequently adopted *Title* 4 legislation referred to, makes inescapable the conclusion that not only was the legislature then aware of municipal contracting with commercial pounds but further that it chose only to qualify that activity in accordance with the limited mandate of *N. J. S. A.* 40:48–5.1 rather than to prohibit it altogether.

Plaintiffs finally seek to sustain their position on the common legal question by arguing that the office of municipal poundkeeper is a mandatory office. If it is a mandatory office, they contend, its duties cannot be fulfilled by a private contractor and, moreover, can be fulfilled only if the municipal officeholder has available to him a municipal facility for impoundment and disposal of animals. Thus, the argu-

---

[3] The 1941 version of *N. J. S. A.* 4:19–15.16 required that impounded dogs be "destroyed in a manner causing as little pain as possible." The 1974 amendment of that statute prohibits the sale or the making available of an impounded animal by a pound "for the purpose of experimentation." The State Department of Health regulations theretofore cited include detailed rules for the physical, both indoor and outdoor facilities of pounds, for the housing of animals in primary enclosures, for the feeding and watering of impounded animals, for sanitation and disease control and for painless death of unclaimed animals.

ment concludes, municipalities must maintain their own dog pounds to support and make meaningful the mandatory public office.

That argument not only ignores the plain meaning and legislative history of *N. J. S. A.* 40:48–5.1 and the ensuing *Title* 4 legislation but also miscontrues the specific statutory authority relating to specific forms of municipalities marshalled by plaintiffs in support of this contention. First, the generally controlling law in respect of this office is *N. J. S. A.* 40A:9–154, which provides in full as follows:

> Except as otherwise provided by law the governing body of any municipality, by ordinance, may provide for the appointment of poundkeepers as needed. The governing body shall determine the number required and their qualifications, terms of office and method of compensation and prescribe their powers, duties and functions.

Thus it is clear that except for the "otherwise provided by law" qualification, the office of poundkeeper in every type of municipality is neither mandatory nor elective, but rather is completely discretionary, requiring affirmative municipal action for its creation and implementation. The court is further satisfied that there is no other law applicable to any particular type of the several forms of municipal government mandating either appointment or election of a municipal poundkeeper.

An analysis of the history and scope of *N. J. S. A.* 40A: 9–154 indicates first that this section was intended by the Legislature to replace its predecessor provision, *N. J. S. A.* 40:46–9, expressly repealed by *N. J. S. A.* 40A:9–175. *N. J. S. A.* 40:46–9, which was also applicable to all types of municipalities, had provided that the office of poundkeeper was to be appointive rather than elective, and further that the number of poundkeepers and their terms, qualifications, bonds, duties and powers were to be determined by ordinance not inconsistent with law. Since the adoption of an ordinance was thereby required as a prerequisite to the creation of the office and hence to the appointment of the of-

ficeholder,[4] and since adoption of an ordinance is manifestly optional with the governing body, it is evident that the import of that legislation was also to constitute the office a discretionary one. That conclusion is further compelled by the language of *L.* 1922, *c.* 150, the predecessor of *N. J. S. A.* 40:46–9, whose clear intendment was first to eliminate the office of poundkeeper in all municipalities as an elective one and, second, to constitute it an optional appointive office by requiring a prerequisite enabling municipal ordinance. That intention of the 1922 statute is moreover expressed in its introductory statement,[5] which reads in full as follows:

The object of this bill is to provide for the election of poundkeepers by governing bodies of municipalities rather than by placing same on the ballot. In most municipalities, particularly the larger cities, the office of poundkeeper is more or less inconsequential and is used frequently by the voters to express a humorous tendency by voting for some prominent personage for such an insignificant office. It will also save the expense of printing and reduce the size of the ballot with resultant saving, amounting to thousands of dollars annually throughout the State. It will further reduce the number of marked ballots.

It would hence seem clear that *N. J. S. A.* 40:46–9 and its predecessor must be regarded as implicitly repealing any prior legislation applicable to any particular municipal-government forms which may have constituted the office of poundkeeper either as an elective one or a mandatory one or both. Therefore, since a repeal of a repealer does not automatically revive the legislation first repealed, see *N. J. S. A.* 1:1–3.2, there was no other law as of the time of the adoption of *N. J. S. A.* 40A:9–154 providing to the contrary. Moreover, by 1922, when the predecessor of *N. J. S. A.* 40:46–9 was adopted, there was qualifying legislation in respect of all forms of municipal government affecting the

---

[4]Poundkeepers already in office were, by the savings clause of the statute, unaffected for the balance of their original terms.

[5]See Statement to Assembly Bill 166 (1922).

viability of any elected, mandatory poundkeeping office there-tofore required.

Thus, the early township statute, *N. J. S. A.* 40:145–2, first adopted in 1899, included in its general listing of required elective officers "so many poundkeepers as shall be deemed necessary." Even if this were construed to require at least one elective poundkeeper, a doubtful construction at best, this requirement was effectively vitiated by the 1912 adoption of what is now *N. J. S. A.* 40:145–18, relating exclusively to poundkeepers and providing that a township "may by ordinance appoint a poundkeeper and fix his term and compensation." Application of the canon of statutory construction by which a later, specific enactment must be regarded as superseding the contrary provisions of an earlier and general one, see, *e. g., O'Keefe v. Dunn,* 89 *N. J. Super.* 383, 392 (Law Div. 1965), compels the conclusion that by 1912 the office in townships was an optional one. Similarly, with respect to towns. *N. J. S. A.* 40:125–1, which derived from an 1895 source, lists among required town officers "one or more poundkeepers". *N. J. S. A.* 40:132–16, however, which derives from a 1912 source, provides to the contrary that the governing body of any town may by ordinance appoint a poundkeeper. The Borough Act, and more particularly *N. J. S. A.* 40:87–15, expressly constitutes the office of poundkeeper as an optional, appointive office, no contrary provision having been carried into the general 1937 statutory revision. Plaintiffs point to no other form of municipal government, nor has the court's own research indicated any other form, in respect of which the office of poundkeeper is specifically and expressly referred to by statute. In view of the foregoing, plaintiffs' reliance on *White v. Tallman,* 26 *N. J. L.* 67 (Sup. Ct. 1856), is misplaced, first because it does not hold, as they insist, that the office of poundkeeper was therein determined to be mandatory,[6]

---

[6]To the contrary, the court therein ruled that "a poundkeeper is not required by the business of a municipal corporation, nor is

and second, because its authority is in any case clearly superseded by the subequent legislative action heretofore discussed.

▪ The court is aware that plaintiffs are dedicated not only to questions of public health and safety but are also devoted to improving and monitoring the conditions pursuant to which stray domestic and other dumb animals are handled and disposed of. The court does not, of course, intend to deprecate the extent of their concern. It is, however, compelled to note that the present philosophical commitment in this State to home rule imposes upon our municipalities areas of governmental responsibility which are already beyond their financial ability to cope with effectively. There are thus critical human needs of our citizens of much higher priority, such as education, housing assistance, senior citizen programs, day care centers, half-way houses, environmental improvement programs, and land use planning and implementation, which are now being inadequately dealt with. See, generally, New Jersey County & Municipal Government Study Commission, *Creative Localism: A Prospectus* (1968). Our municipalities are also, of course, widely disparate in size, population, character, needs, available financial and human resources, and the types of problems which they face. In the absence, therefore, of the clearest legislative mandate, it would clearly be inappropriate for a court to impose upon every municipality, irrespective of all these considerations, the financial burden of constructing, maintaining and staffing an animal pound. The Bergen-type municipalities are therefore clearly entitled to cope with the stray domestic animal situation in such manner as in their respective judgments they deem most appropriate, including the contracting, on public bidding, with commercial pounds.

▪ As to the Hudson-type municipalities, the question still remains as to the scope and constitutionality of the

the office necessary or essential to the exercise of any of the powers enumerated in the charter." 26 *N. J. L.* at 71–72.

statutory humane-society preference. Contrary to the assertions of various of the defendants, the court finds no fatal vagueness in the provisions of *N. J. S. A.* 40:48–5.1. The defendants assert, among other things, that the phrase "humane society or other similar association not organized for profit" does not sufficiently identify the intended groups. This contention is specious. The reference to "humane society" clearly is a reference to a society for the prevention of cruelty to animals incorporated pursuant to *N. J. S. A.* 4:22–1 *et seq.* (state society), or *N. J. S. A.* 4:22–5 *et seq.* (county society), or *N. J. S. A.* 4:22–10 *et seq.* (local society). Indeed, three of the plaintiffs, the Cumberland County, Hudson County, and Ocean County District SPCAs, are within this class. Nor can there be any doubt as what a "similar" nonprofit association is. *N. J. S. A.* 4:22–13 specifically authorizes any corporation incorporated under any special or general law for the purpose of providing for the welfare of dumb animals to include in its charter enumerated powers and purposes directed towards protecting and caring for dumb animals and operating appropriate facilities, including pounds. Thus, the "similar association" provision of *N. J. S. A.* 40:48–5.1 patently includes any corporation organized under *Title* 15 of the *Revised Statutes* or under any other nonprofit association law whose charter complies with *N. J. S. A.* 4:22–13.

 The more substantial question raised by *N. J. S. A.* 40:48–5.1 is the meaning of the phrase "shall enter into negotiations and may contract". Initially, it is clear that ordinarily the statutory use of the word "shall" denotes the imperative and mandatory while "may" denotes only the permissive and directory, and that these words will be so construed unless there is clear indication of legislative intent in the purpose and context of the statute compelling otherwise. See, *e. g., Harvey v. Essex Cty. Bd. of Freeholders,* 30 *N. J.* 381, 391–392 (1959); *Kohler v. Barnes,* 123 *N. J. Super.* 69, 81–82 (Law Div. 1973). No such

contrary intent is here evident in view of the stated legislative purpose and history heretofore referred to. It is further clear that the use of the two words in close juxtaposition, as here, is strongly indicative of a legislative intent that their ordinary meaning be ascribed. See, *e. g., East Orange v. McCorkle,* 99 *N. J. Super.,* 36, 43 (App. Div. 1968).

Nor is the extent of the municipal obligation under this construction open to substantial question. The requirement to negotiate manifestly intends a negotiation in good faith whereby the municipality would be at least obliged to solicit a proposal from any nonprofit humane association which has maintained a pound in its county for at least one year, and would be further obliged to consider that proposal in terms of its own needs, required facilities, available facilities, cost factors and any other pertinent considerations. Since, however, it is not compelled to contract with the association, it may reject the proposal if in the fair exercise of reasonable discretion and as a matter of fair business judgment, honestly and not arbitrarily or capriciously exercised, it is satisfied that other arrangements are available or are required which better serve the public interest. *Cf., e. g., Ott v. West New York,* 92 *N. J. Super.* 184, 198, 202 (Law Div. 1966) ; *Edelstein v. Asbury Park,* 51 *N. J. Super.* 368, 389–390 (App. Div. 1958). The municipality is further free to prepare specifications for public bidding and to consider public bids from commercial dog pounds after it has opted to reject the humane society proposal, or it may compare the humane society proposal with those specifications after the bids are received, rejecting all bids in favor of the humane society. Thus, this court holds that all that the statute requires before a commercial contract is let is that the municipality first consider the desirability and acceptability to it of contracting for the performance of the required services with a humane society.

The final question is whether or not this statutory scheme is violative of the Equal Protection Clause of the Fourteenth Amendment. It is, of course, elementary that the separate classification of profit and nonprofit associations cannot be deemed to be constitutionally offensive so long as the classification is not patently unreasonable. Nor will the classification be deemed unreasonable if it bears a reasonable relationship to a permissible legislative objective or is based upon a relevant public policy consideration. Thus, as a matter of constitutional imperative, if any state of facts reasonably may be conceived to justify the distinction upon which the classification is based, the classifying legislation must be upheld. See, generally, *David v. Vesta,* 45 *N. J.* 301, 314–315 (1965); *Borland v. Bayonne Hospital,* 122 *N. J. Super.* 387, 396–397 (Ch. Div. 1973), aff'd o. b. 136 *N. J. Super.* 60 (App. Div. 1975). Plaintiffs point to the legislative statement accompanying the predecessor of *N. J. S. A.* 40:48–5.1 as conclusive of the reasonableness of the classification. While the court, for the reasons heretofore set forth, is not impressed with the continued viability of legislative assumption that commercial pounds are likely to treat animals cruelly, nevertheless, there are other distinctions between the commercial and noncommercial associations expressed in the statutes and suggested by various of the defendants which do adequately support the legislative classification. The humane societies indisputably perform a variety of services in addition to poundkeeping which are meritorious of public encouragement, such as sponsoring educational services and administering school programs, maintaining pet adoption services and advertising campaigns in regard to lost pets, performing spaying and neutering services, and generally, in accord with *N. J. S. A.* 4:22–13, doing "any and all things which would benefit or tend to benefit dumb animals," all on a nonprofit basis. Nor, finally, do the commercial poundkeepers have a constitutionally protectable right to free and open competition with charitable nonprofit, public service organizations which otherwise serve

the public interest in an area of legitimate governmental concern. See *Borland v. Bayonne Hospital, supra,* 122 *N. J. Super.* at 402. There is, of course, nothing either novel or constitutionally offensive in a legislative enactment providing for the according of preferential treatment by municipalities to charitable organizations whose services are rendered in the public interest and which promote the public welfare. See *N. J. Const.* (1947), Art. VIII, § I, par. 2, ensuring the taxation exemption for eleemosynary associations. And see, *e. g., N. J. S. A.* 40A:12–14(c), 15 and 21, providing for the sale and lease of land on nominal negotiated terms by a municipality to nonprofit associations.

▐▐ This court having thus held that the Hudson-type municipalities must negotiate with humane societies, at least to the extent herein indicated, before they may contract with commercial poundkeepers, the question is necessarily posed as to the viability of commercial contracts which have been entered into by such municipalities without prior negotiation with a humane society. Both Guttenberg and Kearney have stipulated in this action that they did not so negotiate. The parties have not expressly addressed themselves to this issue, which requires determination as to whether those commercial contracts may continue to be performed until the expiration of their stated terms or must be now deemed invalid. It is clear at least that there should be no hiatus in the services being presently rendered by those commercial poundkeepers and that in the public interest those contracts should continue viable at least until a new contract is entered into. There is also, moreover, the question as to whether or not such a commercial contract should be invalidated without a showing by plaintiffs or one of them that a negotiation with it would have been reasonably likely to have produced a contract with the municipality. There have been no proofs before this court as to where the humane societies' pounds are located, and this, of course, is an important consideration for municipalities who are required to

consider use of their services. Nor has there been any proof of their capacities and whether they would be able to accommodate all of the municipalities in the county. Nor has there been proof of relative costs as between use of a humane society's pound and a commercial pound. Clearly, there have been steps taken for performance of these contracts by the commercial poundkeepers, who may well be substantially prejudiced by an invalidation of the contracts prior to the expiration of their respective terms, and the public would hardly benefit from such an invalidation if what were to result therefrom would be an unsuccessful negotiation with a humane society followed by rebidding for a new commercial contract. The issue, therefore, clearly cannot be determined on a motion for summary judgment. Should plaintiffs or any of them wish to seek invalidation of any such contracts for the balance of their terms, they are hereby directed to do so by filing of an appropriate motion with this court within 30 days from the date hereof, supported by brief and affidavit or, if appropriate, an offer of proof. If any such motions are filed, the court will then determine whether and, if so, to what extent, further discovery or testimony or both may be required.

For the reasons herein stated, the motion for summary judgment of the Bergen-type municipalities dismissing the complaint against them is granted. The motion for summary judgment of the Hudson-type municipalities is partially granted, adjudicating their right to contract, pursuant to the public bidding laws, with commercial poundkeepers after they have negotiated in good faith but unsuccessfully with a humane society which has operated a pound for at least one year in their respective counties. The motion for summary judgment of the plaintiffs is denied.